**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No. 07-426 (KSH) |
| v. | |
| FRANZ COPELAND SUTTON, | **Opinion on Defendant's Application for a Downward Variance as a Federal Detainee Housed in Passaic County Jail** |
| Defendant. | |

**Katharine S. Hayden, U.S.D.J.**

Franz Copeland Sutton is arguing for a lower sentence on the basis that the overcrowding in Passaic County Jail, where he has spent seven months, is so bad that to do otherwise would be excessive punishment.   Having heard his testimony, and that of the warden of the Jail and highly placed municipal and state officials, I firmly believe that Franz Copeland Sutton's case forces the question of how long we continue to turn a deaf ear, mine included.

It has become a tired fact of life in these courtrooms that Passaic County Jail is overcrowded, is breaking down, and is a very rough place to serve time.  "Tired" because these observations come up so often, and alternative resources are so scarce, that the reaction has been a shrug that there is nothing one can do.   But the Office of the Public Defender, through AFPD Peter Carter and the power of subpoena, has brought together the Warden of Passaic County Jail, the Fire Inspector of the City of Paterson, and the Coordinator of the Bureau of County Services for the state Department of Corrections into this courtroom to answer hard questions about what this overcrowding really means.  None of these men were evasive, and all were unanimous in demonstrating that overcrowding in Passaic County Jail has made conditions unacceptable.  And so, as a federal detainee sent by this Court to Passaic County Jail for seven months, Sutton has demanded, with reason, that attention must be paid.

[1]

First, some background about how federal detainees are housed, keeping in mind there is no federal detention center in New Jersey, which has placed a great burden on the United States Marshals Service (USMS).  In order to house federal prisoners, the USMS has entered into an Intergovernmental Agreement with several of New Jersey's county jails.  Most of the county jails that have an Agreement with the USMS hold a handful of USMS prisoners on request.  The county jails where the Intergovernmental Agreement is most utilized are Salem, Hudson, and Passaic.  Passaic County Jail houses between four and eight times the numbers at the other two facilities, currently housing about 400 federal detainees.  To be specific, these numbers refer to prisoners who are in the custody of the USMS, not the Department of Homeland Security.  To illustrate:  when Franz Copeland Sutton was arrested by officials of Immigration and Customs Enforcement, he was detained at Hudson County Jail along with other ICE prisoners.  When he was indicted for illegal re-entry, he was transferred to Passaic County Jail because he went into USMS custody and that is where there was a bed available for him.  When he pleaded guilty to the charge, he remained in USMS custody and was returned to Passaic County Jail to await sentence.

Sutton's shift between county jails as a consequence of which agency had custody of him, and his detention awaiting disposition of the charges and ultimately his sentencing, are commonplace; frankly, the length of time he has been in custody could be called relatively brief because on average, federal detainees stay longer awaiting disposition of their cases than local or state prisoners.  As confinement goes, Sutton drew the wrong straw — again, not surprising since the chances were four times greater he would go to Passaic as opposed to Hudson County Jail.  The 54 by 40 foot dorm-style room, 2G-4, where he lived with 64 other federal detainees is identical in population and setup to the other dorm-style units in the jail.  Precisely because the outside markers of his case are so familiar, their import gets lost until you look long and hard at what the over-incarceration of human beings in this particular structure is costing.

[2]

First, there is the cost in dollars.  Through the Intergovernmental Agreement, the federal government pays into the general treasury of Passaic County between $12 and $14 million per year. That is broken down as $87 per day for between 350 and 400 federal prisoners, with the average count usually on the high side.  At those numbers, federal prisoners account for approximately 20% of the jail population of over 2,000 inmates.  But Passaic County Jail has a design capacity, according to Warden Charles Meyers, of 896 prisoners, male and female.  One could say, then, that by the time the first federal prisoners are added to the local and state inmate population, Passaic County Jail's population is at nearly two times its design capacity.  And one must keep in mind that jails are not spacious to begin with, so operating at full design capacity is already an overcrowded situation.

Then there is the human cost in maintaining and perpetuating this aging structure.  Warden Meyers testified that any public building should be replaced after 25 years, and Passaic County Jail is over 50 years old.  For months standing water plagued the jail until a new roof was put on.  There are 30 maintenance employees detailed solely to keep the building functioning.  Focusing on Sutton's unit, 2G-4, which housed exclusively federal detainees, Sutton testified to sewage backup that flooded the shower area after the shower drains clogged up, not once but five or six times.  One of the three showers in 2G-4 never worked during Sutton's time there.  There is no air-conditioning and temperatures reach 100 degrees, according to Warden Meyers, in the summer; and in the winter, Sutton testified, it is so cold that prisoners can see their breath and there is ice crystallizing on the walls. In order to provide ventilation, prisoners in 2G-4 utilize a primitive red light/green light blower system whereby the red light brings in air from outside and the green light pulls out the internal air.  But however putrid the inside air becomes (more on that below), Sutton testified that bringing in the outside air actually makes things worse because of what gets dumped into the room:  "Just a big cloud of fiber, white dust, dirt, fiber.  And whoever's bunk was directly under it, they would have to take

everything off the bunk and shake everything out." There is mold covering the bathroom area and shower area, and no ventilation or fan nearby.

Then there is the greatly increased risk of loss of life should there be a fire. There is no sprinkler system in any of the prisoner units. The fire alarm panel, at the time that the city Fire Inspector testified, had a blinking "trouble" light. He did not know if the alarm system could actually send a signal to the fire department in an emergency. Passaic County Jail has not been in compliance with municipal fire regulations for years and as of the hearing in Sutton's case, despite seven extensions of time to come up to code, it was still in violation. The city seems never to have imposed a sanction.

City of Paterson Fire Inspector Samuel Gaita was particularly effective in describing the problems unique to safeguarding a correctional facility from being destroyed in a fire. In an emergency, unlike other public buildings, a jail or prison goes into lockdown so that corrections staff can assess and control the situation. If a fire breaks out, the public safety consideration behind the lockdown needs to be reconciled with the rescue of staff and inmates. So fire regulations require a "passive" fire protection system that uses an alarm coupled with a sprinkler system and does not need human effort to function. But in Passaic County Jail only the offices and the medical unit have sprinklers; Fire Inspector Gaita testified that elsewhere fire safety is addressed by a fire watch (a corrections officer assigned each shift to patrol unoccupied areas), a manual hose system, and fire extinguishers placed in various areas. This directly violates the requirement of a passive fire system, and has been the subject of regular interaction between jail personnel and the Paterson Fire Department since 2002, the year a fire broke out in the basement of the jail.

As for response to the threat of fire under the present circumstances, Warden Meyers testified that 2G-4, with its population of 64 men, is identical to three other dorm-style units that form a quadrangle around a guard station manned by one corrections officer. Another corrections officer patrols the catwalk around the guard station that borders the four prisoner units. In a fire, Fire

Inspector Gaita noted that smoke would make evacuation and response very difficult.  He said he asked officials during his inspection for the occupancy load of the building, and was not given the information or the occupancy certificate.  He was specific that overcrowding in his opinion increased the risk of fire; he also testified that no risk assessment had been done concerning fire safety at Passaic County Jail.

So, crumbling structure, fire safety violations, and little value received for the millions of dollars paid into county revenues.  How has Passaic County Jail managed to avoid sanctions from the Department of Corrections (DOC) when it is housing more than twice the number of prisoners it was designed to hold, and, according to Warden Meyers, has done so for decades?   This is how: by means of a regular series of waivers issued by the DOC on the strength of promises that the facility would be expanded or replaced.  This disturbing history was the subject of testimony from Joseph Hartmann, the Coordinator of the Bureau of County Services, based on his experience of over two decades with the Department of Corrections. [1]

Hartmann's growing frustration with Passaic County Jail was evident during his testimony, as he described a dispiriting song and dance that has gone on for years that suggested, but never made, actual progress. In a nutshell, the Department of Corrections inspects the facility annually, and inevitably finds, because too many people are crammed together, violations of the administrative code; then Passaic County asks for and is granted a temporary rule exemption to excuse the violations. Rather than being a temporary remedy the practice has been ongoing for Passaic County Jail, it appears, since the incarceration boom that began in the 1970s. Hartmann testified that of all county jails in New Jersey, only Passaic County Jail has been living on waivers. The DOC does appear ready to step off the dance

---

[1] Both Warden Charles Meyers and Mr. Hartmann were candid witnesses.  Their collective experience of the failure of Passaic County Jail to be funded and improved despite its manifest shortcomings has led them to be vocal and they did not evade the hard questions.  Like so many professionals in the field of corrections, they impressed this Court as caring individuals who are hampered by a public sentiment that considers offenders better not seen and not heard.  In a sense, society "gives" them individuals to manage.  Commentators have likened the role thrust on corrections to a form of waste management, as cruel and ugly as that concept may be.  Interestingly, that is not what corrections professionals think they are doing.  Why do we?

floor from recent documents subpoenaed by Sutton that show some movement from the talking to the planning stage for a new facility.  But that small progress is as much a product of the fact that the DOC will no longer grant the two-year exemptions and, lately, through Hartmann pressing the issue, has put Passaic County Jail on a six-month schedule.   That said, from Hartmann's testimony, any new facility is years away assuming approval.  There appears to be no assurance that a new facility would gain the political support necessary to be approved.

Hartmann attributed the unwillingness to apply the immediate remedy of "depopulation" (i.e., doing what other counties have done and refusing to take USMS prisoners because to do so would create unacceptable overcrowding) to Passaic County's reliance on the revenue stream from housing nonlocal prisoners, which he has characterized as "corrections for profit."  Hartmann noted that the county has progressed no further than conducting a suitability review, which examines the current facility to determine if a new facility is needed because the old one is no longer suitable.  That such an unnecessary measure is seriously being undertaken is appalling, suggesting as it does that Passaic County Jail could ever be suitable given the over-incarceration there.  But this tepid reaction to a massive problem would doubtless be deemed typical by Warden Meyers, who when asked if he has brought the problems in the jail to the attention of county management, replied with some force:  "I do indicate at every given opportunity, that the facility is aged and deteriorating and overcrowded, and the county is relying upon the revenue generated by housing [state and federal] prisoners and that revenue could be at risk if at any time someone were to order that the inmates would be removed.  And I do say that when that happens, not if that happens."

It was plain from the testimony of those "in the know" that they are fed up, and fully aware of the indignities and failures that Sutton has complained about.  This recognition is important, and undermines the United States Attorney's arguments that something special must befall Sutton as a

predicate for sentencing relief.[2]  The government relies on United States v. Stevens, 223 F.3d 239 (3d

Cir. 2000) and United States v. Luna, 2002 U.S. Dist. LEXIS 6207 (E.D.Pa. Apr. 10, 2002) for the

proposition that this Court can only consider pretrial confinement conditions where a defendant

suffered deprivations beyond what other similarly situated inmates faced.  But in Stevens, the Third

Circuit declined to disturb the lower court's determination that it had the legal authority to grant a

departure based on substandard pretrial conditions affecting the inmates generally.  Stevens, 223 F.3d

247-49.  And Luna relies on United States v. Pacheco, 67 F. Supp. 2d 495, 498 (E.D.Pa. 1999), which

relied on United States v. Sutton, 973 F. Supp. 488 (D.N.J. 1997).  But both the Luna court and Pacheco

district court decisions overstate the holding in Sutton.  The Luna court, relying on Pacheco, read Sutton

to mean that a defendant has the burden of showing that he suffered conditions that compare

unfavorably to those suffered by other inmates; however, the Sutton opinion contains no language to

support the Pacheco court's reading.

       In United States v. Sutton, Judge Bassler addressed whether a sentencing court can consider

substandard conditions of pretrial confinement under the Sentencing Guidelines.  Basing his reasoning

on the Supreme Court's holding in United States v. Koon, 518 U.S. 81 (1996) and a survey of the

Sentencing Commission's consideration of pretrial confinement as a sentencing factor,[3] or more

appropriately the lack thereof, he concluded that "unusual pretrial confinement, however, in either

length or severity of condition, can properly be considered by the sentencing court."  Sutton, 973 F.

---

[2] While firmly opposing a variance, the Office of the United States Attorney, to its credit, did not oppose Sutton's
making a full factual record of the problems in the jail.

[3] A sentencing court has authority to consider factors not identified by the Sentencing Commission. The U.S.
Sentencing Guidelines Manual § 5K2.0 provides in relevant part:

       The sentencing court may impose a sentence outside the range established by the applicable guidelines, if
       the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not
       adequately taken into consideration by the Sentencing Commission in formulating the guidelines that
       should result in a sentence different from that described. . . . The decision as to whether and to what
       extent departure is warranted rests with the sentencing court on a case-specific basis . . . . Presence of
       any such factor may warrant departure from the guidelines, under some circumstances, in the discretion
       of the sentencing court.

[7]

Supp. at 493.  Judge Bassler ultimately declined to grant a departure based on this factor but did so because the defendant had not "produced any evidence indicating that the conditions at Union County Jail are atypical as compared with jails in other jurisdictions." Id. at 494-95.  This Court, however, has the benefit of a record rife with evidence that the conditions at Passaic County Jail are atypical. One need only consider thoughtfully what living in 2G-4 is like on a daily, practical level thanks to the waivers, to see this is so.

First, consider the subtle shift in capacity load reflected in DOC Inspection Reports for 2004 through 2007 that Sutton presented.  In the 2004 and 2005 Inspection Reports, operational capacity of Passaic County Jail was reflected as 763 males and 54 females, roughly the number given by Warden Meyers.  In the 2006 Inspection Report, operational capacity was listed as 763 males and 54 females, with a parenthetical indicating operational capacity was 1,719 males and 154 females "with waiver." (J.A. 000432.)  In the 2007 Inspection Report, the operational capacity was flatly listed as 1,729 males and 154 females without any indication that these numbers were adjusted for waivers.  (J.A. 000502.)  In other words, first the jail obtains the waiver and then the waiver becomes the status quo.  In keeping with this phenomenon, the USMS stated Passaic County Jail's operational capacity at its waiver-based level, according to a Detention Facility Investigative Report dated February 9, 2006 (J.A. 000055), which indicates that the facility capacity is 1,668 males and 206 females.  One concludes that if someone or some entity is willing to operate the facility at over twice its design capacity, an operational capacity is created — but only, only on paper.

The categories in which Passaic County Jail enjoys its traditional rule exemptions are the dimensions of unencumbered square footage per inmate, the toilet to inmate ratio, the wash basin to inmate ratio, and the shower to inmate ratio.  Additionally, the facility uses triple bunking, a practice not countenanced by the Code.

Warden Meyers provided a diagram of 2G-4, which gives dimensions and illustrates the

arrangements of bunks, tables, commodes, urinals, showers, sinks, and other features.  (J.A. 000154.)

The room is a rectangle with one corner foreshortened to accommodate the quad design, with

dimensions of 54 by 40 feet.  He testified that the average number of inmates housed in this unit is 64,

the maximum number of inmates permitted in any unit.  As earlier indicated, the unit is one of four, all

identically arranged and similarly overpopulated, that form a quadrangle in the center of which is an

officer's station bordered by an officers' catwalk.   One officer mans the officer's station, and one officer

patrols the catwalk.  There is no direct supervision in any of the prisoner units, meaning that only

inmates are inside the unit itself unless a corrections officer comes in for a specific reason.

Because, as the 2007 DOC Inspection Reports puts it, the "inmate population far exceeds the

ability to allow 25 square feet of unencumbered space" (J.A. 000506) as required by the Administrative

Code, and the population also "far exceeds the ability to allow 35 square feet of dayspace per inmate"

or "provide sufficient seating and eating surfaces" (J.A. 000508), this is what has happened.  The inmate

sleeping area is also the inmate dining area (J.A. 000509); and there is no dayroom separate and apart

from the sleeping area, even though a dayroom is a requirement under the Administrative Code that

must contain 35 square feet of floor space per inmate exclusive of lavatories, showers and toilets, with a

sufficient number of seating, writing, and eating surfaces.  Instead, 2G-4 is a dayroom that has become

the inmate sleeping and dining area (J.A. 000508 and 510). Also, according to the Report, "the inmate

population does not allow for" the following ratios:  at least one toilet for every 12 male inmates; at

least one operable wash basin with hot and cold running water for every 12 inmates with one

unbreakable mirror per wash basin; at least one operable shower for every 16 inmates. (J.A. 000508-

509.) In 2G-4, for 64 men there are three commodes and one urinal, four sinks, and three showers, one

of which does not work.  Also, because the inmate sleeping area is also the inmate dining area, inmates

are not able to eat together in small groups (J.A. 000509), and because the dayroom area is also the

sleeping and dining area, 2G-4 and other units like it do not comply with the requirement that "dining areas shall not contain exposed toilets in the same room or in the view of inmates dining." (J.A. 000510.) Translated, 2G-4 is a composite eating/sleeping/toileting/bathing/shaving area where 64 men live together 23 hours per day.

It is relevant here to think about what has happened in the penal system since 1977, when the Supreme Court of the United States disappointed prison reform advocates and decided that double-celling or double-bunking (putting two prisoners in a cell designed for one) was constitutional. Their reasoning relied on the existence of dayroom space, and a finding that inmates had, under the design of the facilities in question (MCC in Foley Square, Manhattan, and the Southern Ohio Correctional Facility, a state penitentiary), enough living space even after doubling up. Rhodes v. Chapman, 452 U.S. 337 (1981); Bell v. Wolfish, 441 U.S. 520 (1979). Members of the Court were nonetheless skeptical. Justice Brennan in his concurrence in Rhodes wrote: "I have not the slightest doubt that 63 square feet of cell space is not enough for two men. I understand that every major study of living space in prisons has so concluded. That prisoners are housed under such conditions is an unmistakable signal to the legislators and officials of Ohio: either more prison facilities should be built or expanded, or fewer persons should be incarcerated in prisons." 452 U.S. at 365-366 (Citations omitted). Thurgood Marshall was less restrained in his dissent:

> In a doubled cell, each inmate has only some 30-35 square feet of floor space. Most of the windows in the Supreme Court building are larger than that. The conclusion of every expert who testified at trial and of every serious study of which I am aware is that a long-term inmate must have to himself, at the very least, 50 square feet of floor space-an area smaller than that occupied by a good-sized automobile-in order to avoid serious mental, emotional, and physical deterioration.

In a footnote to that text, Justice Marshall added: "The bed alone, which is bunk-style in the doubled cells, takes up approximately 20 square feet. Thus the actual amount of floor space per inmate, without making allowance for any other furniture in the room, is some 20-24 square feet, an area about the size of a typical door."

[10]

The overcrowding since these decisions came down is worse than those described by the Supreme Court.  Apparently society's standards of decency have not evolved, but rather coarsened, and we are the worse for it.  So we see that current standards in New Jersey's Administrative Code, which is based on national standards, permit reduced amounts of unencumbered space in sleeping and dayroom areas, and are arguably offensive under the articulated reasoning of Bell v. Wolfish and Rhodes v. Chapman.  But we are way past that kind of debate when considering the conditions in 2G-4.  Even assuming the Code standards are tolerable, and not something to be queasy about, the mind boggles at how little square footage of living space is available to each of the 64 men in 2G-4, filled up as it is by 26 bunks, some double, some triple; three showers, four sinks, three commodes, one urinal, three eight-foot tables with attached benches, a half-wall in front of the commodes, and 64 human beings moving about.

This is what a resident of 2G-4 encounters.  Warden Meyers and Sutton testified consistently with each other that at mealtimes, most of the inmates in 2G-4 eat at, alongside, or on their bunks.  The "dayspace" of sorts consists of three eight-foot tables that have attached bench seats that fit four people alongside one another.  The tables are in full view of a steel perforated half wall behind which are the three commodes and one urinal, the nearest of which is about 6 or 7 feet away, so that an inmate eating a meal at one of the tables could be within six feet of a person using the commode, and there is no ventilation nearby.  There are 26 six-foot long bunks, 14 double and 12 triple, lined up along the walls and in the middle of the unit as well, close by one another.  Warden Meyers' diagram shows 22 inches between bunks.  According to Sutton, assuming a normal sized man was walking between two bunks, "you would brush.  If someone [was] laying on the bunk, you would brush up against them."  Likewise, Sutton testified that inmates seated on the benches attached to the tables would be bumping against each other while eating, and generally the overcrowding meant people were bumping into each

[11]

other.  "[Y]ou had to be very careful.  You know, you have a bunch of men, you have to be very careful not to bump into anyone."

The problem of toileting is acute.  There is no ventilation around the commodes, which are located just feet away from the tables where people eat and otherwise get away from their bunks. When someone is using the commode, Sutton testified that those nearby "would pull our T-shirts over our face."  For privacy, the inmates put a sheet over the perforated steel half wall in front of the commodes.

Meals are brought to 2G-4 three times a day, with breakfast at 4:30, lunch mid-morning, and dinner in the late afternoon.  Meal trays, according to Sutton, stay in the room for over an hour after the meal is finished.  The presence of food attracts fruit flies and mice.  Also a magnet is the food that inmates get at commissary, which is tucked under the beds because with the limitations on space in 2G-4, inmates have nowhere to store personal items.  For the same reason, inmates are issued only one uniform, which they have to relinquish for laundering. Meanwhile, they sit around in underwear while the item is washed and dried.  Warden Meyers testified that he would prefer to collect dirty laundry and issue a clean set, but between cost and storage (mostly storage), this is the way things work out.

Overcrowding has led to a practice that Hartmann testified is unique to Passaic County Jail – the use of canine units.  In addition to being available to quell disturbances, the dogs, according to Warden Meyers, escort various movements of prisoners.  According to Warden Meyers, "There are movements all day long from different housing units up to our recreation areas, church services, down to medical services.  Anything, any movements of more than five people a dog would be available to help escort that movement as a deterrent.  They also check incoming mail for any occasions of narcotics.  And then they walk through the facility once per shift."  Hartmann and Warden Meyers testified that they were unaware of the use of canine units anywhere in the state other than Passaic County Jail.

Sutton described the noise level as "excruciating because people [are] always making noise.  Not everybody sleeps at the same time.  So between the guys making noise, which you can't tell them not to make noise, that would only invite trouble and the count schedule . . . it is very nerve racking."  Counts,

[12]

when inmates line up and present themselves to a guard standing outside to be checked off — a routine that Warden Meyers estimated to consume about seven hours over the course of the 24 hour day — occur at the beginning and end of each shift.  Razors are distributed at the end of the third shift, and the distribution and collection of razors so men can shave goes on around midnight.  With a breakfast time of 3:30 to 4:30 am, and lights out at 2 am, Sutton testified that there was never an unbroken night's rest.

The atmosphere, he testified, was tense.  More fights broke out and there were more assaults because of everyone's close proximity to one another.  "People who were agitated at the slightest little thing, they would fight.  The slightest, you know, like cut in front of somebody in line to use the urinal.  I have seen fights generated because of that."  One could ask where do those not engaged in a fight go to get away from a fight?  And one does not ask, but one must not live in the clouds about what happens sexually in such a charged atmosphere.

In 2005, after the prison scandal in Iraq, a national commission was formed that was co-chaired by former United States Attorney General Nicholas deB. Katzenbach, and former Chief Judge of the Third Circuit John Gibbons.  The group was called the Commission on Safety and Abuse in America's Prisons (CSAAP) and it held four extensive hearings around the country, including a two-day hearing in Newark in July 2005.  At the top of the first day's discussions was a panel on overcrowding.  The thoughtful testimony can be found online.[4]  Among the highlights are the comments of Professor Craig Haney, whose written statement might have been describing the overcrowding in Passaic County Jail, only 25 miles away, and the unavoidable effects.  "Crowding significantly worsens the quality of institutional life and increases the destructive potential of imprisonment….  Overcrowding limits or eliminates the careful screening, monitoring, and managing of vulnerable or problematic prisoners."  (Warden Meyers' testimony confirms this point.  The only screening of USMS prisoners that takes place

---

[4] http://www.prisoncommission.org/transcripts/public_hearing_2_complete_transcript.pdf.

[13]

before assignment to a bed arises when the marshals alert Passaic County Jail personnel to a particular problem.  Otherwise, the federal prisoners are simply housed together.)

Haney goes on in his written statement to observe that studies show that prison overcrowding leads to greater numbers of prisoner illness complaints.  Sutton testified about his bouts of depression, and is on medication for this; he described a constant state of anxiety brought on by fear of being assaulted.  Professor Haney's written statement indicates that overcrowding is associated with higher rates of disciplinary infractions, and reduces availability of programs within the prison.  "Overcrowding also raises collective frustration levels inside prisons by generally decreasing the resources available to the prisoners confined in them.  The sheer number of things prisoners do or accomplish on a day-to-day basis is compromised by the amount of people in between them and their goals and destinations."  Professor Haney also testified during the panel discussion that the average American prisoner inhabits an environment "roughly the size of a king size bed.  If you have a king size bed at home, that's about 60 square feet.  The average American prisoner lives in an environment just a little bit bigger than that. . . . Imagine having all your worldly possessions in there with you and then imagine also having a friend to share that space with you, or an enemy as the case may be."  In this respect, Professor Haney's testimony does not capture life in 2G-4, where federal prisoners have so much less and where the average stay is about one year to up to three and even four.

The decisions of this Circuit require that after making a sentencing guidelines determination, the sentencing judge consider whether under the 3553(a) factors, the sentence called for by the guidelines is reasonable.  Since United States v. Cooper, 437 F.3d 324, 326-327 (3d Cir. 2006), Third Circuit decisions have repeatedly emphasized the importance of making a serious examination of the sentencing factors, not a rote recitation, and the body of law on sentencing continues to evolve.   The evidence before this Court establishes that Sutton has demonstrated a quality of prison life well below that required by not only New Jersey's Administrative Code, but the federal criminal code as well.  Title 18 U.S.C. Section 3553(a)(2)(D) speaks to that part of federal sentencing authority that touches the quality of life a sentenced offender experiences, requiring the sentencing judge "to provide the

[14]

defendant with needed educational or vocational training, medical care, or other correctional treatment . . . ."

While this particular provision has not been interpreted to require that a sentence actually rehabilitate, United States v. Hankerson, 496 F.3d 303, 309 (3d Cir. 2007), surely its presence forbids a sentence that degrades and dehumanizes the offender who serves it, that in effect provides correctional *mistreatment*. Pretrial detention is fully credited and becomes a part of the sentence served. If the lack of a federal detention facility means our prisoners endure conditions such as daily life in 2G-4 inflicted on Sutton, then the Court must factor into the full sentence the overly punitive nature of such an experience. Sutton's months in Passaic County Jail happened, they cannot be dismissed, and the logical way of acknowledging he was punished "more than was necessary" under conditions that violate one of the goals of a reasonable sentence, is to reduce the extent of the overall sentence he must serve.

Another sentencing factor under Section 3553(a) that compels this conclusion appears in subparagraph (2), "the need for the sentence imposed — (A) to . . . promote respect for the law." A difficulty in confronting the issue that Sutton has raised and the evidence he has produced is that although one can conclude that conditions at Passaic County Jail are shameful, there is no individual at whom the Court can fairly point the blame. But there is much to be shocked about in the number of years these conditions have existed and the failure of response when other counties — Mercer and Hudson come to mind — have improved their facilities and controlled overcrowding. Respect for the moral law that makes the conditions in Passaic County Jail stick in the craw supports a variance, however big or small, as a statement that there is a law of reason and fairness behind detention. "Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. " Olmstead v. United States, 277 U.S. 438, 485 (1928)(Brandeis, J., dissenting).

[15]

The Court will grant a variance below the sentencing guideline range based on conditions in Passaic County Jail as demonstrated in this hearing, and will consider the arguments of counsel at the time of sentencing in the light of this opinion.

Dated:  October 25, 2007                                    /s/Katharine S. Hayden

                                                            Katharine S. Hayden, U.S.D.J.

[16]